## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MICHAEL GUTWEIN,

     Plaintiff,

v.                                          No. 1:15-CV-00672 RB-WPL

TAOS COUNTY DETENTION CENTER ("TCDC"),
and TAOS COUNTY,

     Defendants.[1]

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Taos County Adult Detention Center ("TCADC") and Taos County's Motion for Summary Judgment No. 2 (Doc. 40). Having reviewed the briefing and being fully advised, the Court will **grant** Defendants' Motion.

### I.    PROCEDURAL POSTURE

Plaintiff Michael Gutwein was incarcerated at TCADC, a facility operated by Taos County, between July 27 and September 14, 2013. Doc. 1 at 3; Doc. 39, ex. 40. Acting through counsel, Gutwein sued the County and TCADC for relief under the Americans with Disabilities Act ("ADA"), the New Mexico Tort Claims Act ("NMTCA"), and other state tort law regarding declaratory relief and intentional infliction of emotional distress. *See generally* Doc. 1.

Plaintiff initiated suit in this Court on August 3, 2015. Doc. 1. On August 16, 2016, Defendants TCADC and Taos County moved for summary judgment on Plaintiff's ADA and state law claims. Doc. 40. Plaintiff did not file a timely response to the motion.[2]

---

[1] This caption has been modified to reflect the dismissal of claims against former Defendants Healthcare Partners Foundation and Joe Sprunk. *See* Docs. 16, 25.

[2] Plaintiff initially filed a deficient and inapplicable response on August 30, 2016. Doc. 45. Thereafter, Plaintiff moved to amend/correct the record and amend his response to the motions for summary judgment, which the Court

## II.   DEFENDANTS' UNCONTESTED FACTUAL ALLEGATIONS

Where a Plaintiff fails to provide an adequate response brief, the facts as described by Defendants in their motion are accepted as true for purposes of summary judgment. *See Coleman v. Blue Cross Blue Shield of Kan., Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008); *see also Herrera v. Santa Fe Pub. Sch.*, 956 F. Supp. 2d 1191, 1194 (D.N.M. 2013) (quoting D.N.M.LR–Civ. 56.1(b) ("[a]ll material facts set forth in the Response will be deemed undisputed unless specifically controverted."). Accordingly, the Court accepts Defendants' assertions of undisputed facts, as incorporated from their initial motion for summary judgment (Doc. 39). *See* Doc. 40 at 3. These facts are reproduced below:

1. Defendant Taos County is the public entity responsible for the Taos County Adult Detention Facility.

2. Healthcare Partners Foundation ("HCP") provided all of the medical care for the inmates of TCADC during the time Plaintiff was incarcerated in 2013, pursuant to its contract with the County.

3. Plaintiff Gutwein was incarcerated in TCADC on July 27, 2013.

4. Plaintiff was seen by HCP personnel to have his medical intake completed on July 27, 2013.

5. During the medical intake, Plaintiff denied having any current injuries.

6. Plaintiff did not have any body deformities and had good range of motion.

7. Plaintiff denied being depressed or having anxiety.

8. Plaintiff stated that he takes Clonodine 0.1mg, Morphine 15mg, Diazepam 5mg for muscle pain and hypertension. He stated he had been diagnosed with hypertension.

---

allowed on November 28, 2016. *See* Docs. 58, 89.  However, Plaintiff subsequently failed to comply with the extended response deadline and the Court issued an order striking Plaintiff's untimely responses. Doc. 104.

9. Plaintiff did not mention any shoulder pain and had no complaints during the intake.

10. Plaintiff was referred and transported by HCP to Holy Cross Hospital for a dislocated right shoulder on Sunday, July 28, 2013.

11. At Holy Cross Hospital, Plaintiff was seen by Dr. Michael Howard. In his medical notes, Dr. Howard stated Plaintiff's symptoms as "shoulder dislocation…[patient] dislocates it purposely to relieve pain – now can't get back in."

12. Plaintiff gave Dr. Howard permission to do a closed reduction.

13. In the Orthopedic Reduction notes within the Holy Cross Records, Dr. Howard noted "[patient] self dislocated and reduced here."

14. Dr. Howard then provided a shoulder exam, the reason for exam noted as "dislocated, patient self reduced."

15. Under history, the exam was noted as a "postreduction evaluation."

16. All medical records from Holy Cross Hospital indicate that Plaintiff dislocated his own shoulder, and then put it back into place himself with the help of Dr. Howard.

17. The patient instructions instructed Plaintiff to "follow up with your primary healthcare provider or bone specialist in 5 to 10 days."

18. Dr. Howard prescribed 1 tablet of Ibuprofen every 6 hours.

19. Plaintiff was also given a sling.

20. On Tuesday, July 30, 2013, Plaintiff submitted a medical request asking to continue his medications that he brought in, and to have his vital signs checked because he felt that his blood pressure was high.

21. Plaintiff also complained of withdrawal from opiates and having headaches.

22. Plaintiff was seen in the clinic and advised that the facility is non-narcotic and does not give out controlled substances.

23. Plaintiff's vital signs were taken and were within normal limits.

24. Three days after visiting Holy Cross Hospital, on Wednesday, July 31, 2013, Plaintiff requested to see an orthopedic doctor for his shoulder. He was already scheduled to see his HCP primary care physician, Dr. Campos, over Telemedicine that same day.

25. It was noted that during Plaintiff's medical intake he had no complaints, did not mention a shoulder injury, and showed no signs of pain.

26. During the Telemedicine appointment, Plaintiff showed slight signs of pain and good range of motion.

27. On August 7, 2013, Plaintiff submitted a medical request asking to be weighed and requesting to see an orthopedic doctor.

28. Plaintiff also submitted a request for a sleep aid as well as the medication Phenergan for his stomach.

29. Plaintiff was placed on Phenergan for 14 days per Dr. Campos' orders, scheduled for a 24-hour observation sleep study, and scheduled to be seen by Dr. Campos over Telemedicine on August 8, 2013.

30. Plaintiff had a 24-hour sleep study done on August 7, 2013.

31. On August 8, 2013, Plaintiff was seen over Telemedicine by Dr. Campos.

32. Plaintiff went into the HCP clinic not showing much pain and was able to get up and sit down without any struggle and showed that he had good range of motion.

33. Dr. Campos explained that Plaintiff did not need to see an orthopedist at this time due to the results he saw over Telemedicine. Plaintiff was then placed on Vistaril 25mg twice per day

(BID) for 14 days, and once that dose ended, Vistaril 25mg every evening (QPM) for 20 days for anxiety and to help him relax and sleep.

34. On August 10, 2013, Dr. Campos requested the x-ray and medical records from Plaintiff's hospital visit to Holy Cross Hospital. Dr. Campos also told Plaintiff that he would not be required to see an orthopedist until his records were reviewed.

35. Also on August 10, 2013, Plaintiff put in a medical request asking for a follow up appointment with an orthopedist and that he did not want to see the provider over Telemedicine. Plaintiff was educated that if he had concerns about his shoulder, he had the option to follow up over Telemedicine with Dr. Campos on August 12, 2013.

36. On August 13, 2013, Plaintiff's medical records were received from the hospital and were faxed to Dr. Campos.

37. On August 14, 2013, Plaintiff put in two medical requests asking for a muscle relaxer such as Flexeril, a sleep aid such as Lunesta or Ambien, a Phenergan prescription, and also requested to see an orthopedic doctor.

38. On August 15, 2013, Plaintiff was advised that Dr. Campos did not feel that an orthopedic doctor was needed at that time due to the records received by Dr. Campos on August 13, 2013.

39. Plaintiff was told he could have another follow-up with Dr. Campos over Telemedicine during the next clinic date, during which time Plaintiff could follow up with Dr. Campos for continuation of Phenergan.

40. Plaintiff complained of not being able to sleep and again requested muscle relaxers and Flexeril. An appointment with Dr. Campos over Telemedicine was scheduled for the following Monday, August 19, 2013.

41. A sleep study was conducted the night of August 17, 2013.

42. Plaintiff was noted to have been awake from midnight until 5:00 a.m. on August 18, 2013.

43. On August 19, 2013, Plaintiff put in a medical request stating he could not sleep and that he wanted to see an orthopedist.

44. Plaintiff was seen over Telemedicine by Dr. Campos for the shoulder pain and sleeping problems.

45. Plaintiff stated that his shoulder really hurt during the night time.

46. Dr. Campos prescribed Plaintiff Tramadol 50mg twice per day (BID) for ten days and then Tramadol 50mg every day (QD) for ten days to treat the pain.

47. The treatment plan was discussed and Plaintiff stated he would try the Tramadol.

48. However, that same day Plaintiff refused to take the Tramadol during the evening medication line because he stated that he wanted muscle relaxers instead.

49. Plaintiff signed a Treatment and Medication Refusal Form which contained a waiver. The waiver stated:

> I make this refusal with a full understanding that the refusal to accept medical treatment and or medication may lead to further complications or may aggravate the condition in which I presently have or may cause other medical conditions to develop. Further, I understand that during the course of treatment a Medical Provider may discover other medical conditions, which also require treatment and or medication, and that these conditions may also go untreated. I have had the opportunity to discuss with the Medical Provider my medical condition and the proposed treatment and or medication. I hereby waive, release and agree to hold harmless the County of Taos and all elected officials, officers and employees, including but not limited to the Board of County Commissioners and the Taos County Detention Facility, from any and all claims of liabilities of any and all type whatsoever, whether known or unknown to me at this time, relating to any and all medical conditions which I may have or may have acquired while in the Taos County Detention Facility or which may result or may later occur as a result of my refusal to accept medical treatment and/or medication.

50. On August 20, 2013, Plaintiff refused Tramadol during both medicinal lines and stated he wanted a muscle relaxer and that he did not like the Tramadol.

6

51. On August 21, 2013, Plaintiff requested a muscle relaxer and also to be seen by an orthopedist. Plaintiff was scheduled to be seen over Telemedicine for the next day.

52. On August 22, 2013, Plaintiff was seen over Telemedicine by Dr. Campos who once again determined that Plaintiff did not need to see an orthopedic doctor at that time.

53. Dr. Campos also told Plaintiff that he could follow up with an orthopedist when he was released or that he could request a medical furlough through the courts.

54. Plaintiff's Tramadol prescription was discontinued and Dr. Campos prescribed Flexeril 10mg twice per day (BID) for ten days, and then Flexeril 10mg every evening (QPM) for an additional ten days. Dr. Campos also continued Plaintiff's Vistaril.

55. On August 23, 2013, Plaintiff once again requested a muscle relaxer and to see an orthopedist.

56. He was reminded that Dr. Campos stated he does not need to see an orthopedist at this time.

57. Medical staff also noted that Plaintiff was on Flexeril.

58. Also on August 23, 2013, Plaintiff requested medication to help him sleep.

59. Dr. Kevin McClintock put in a request for a sleep study to be completed. The results of the sleep study would then be submitted to the on-call provider.

60. Twenty-nine days after being booked into TCADC, Plaintiff stated he had foot pain and that he needed the orthotics from the inside of the shoes he wore in when he was booked into TCADC.

61. The medical staff discussed the request with the Major on duty, and the Major stated that Plaintiff could possibly have the orthotics if they were approved by security.

62. On August 26, 2013, Plaintiff requested a sleep aid, asked to see an orthopedist, and complained of foot pain.

63. On August 28, 2013, Plaintiff again requested a sleep aid and complained of foot pain.

64. Dr. Kevin McClintock prescribed Plaintiff Icy Hot Muscle Rub for his foot pain.

65. On August 29, 2013, Plaintiff requested medication to help him sleep and to see an orthopedist.

66. The previously-ordered sleep study did not generate results, so another one was ordered.

67. Plaintiff was again advised that he did not need to see an orthopedist at this time and that he could request a medical furlough or see a specialist once he was released.

68. Dr. Campos prescribed Ambien for Plaintiff in order to assist with his sleeping problems.

69. On August 31, 2013, Plaintiff put in a medical request stating that he could not sleep. Since he had recently been placed on Ambien, no further action was needed at that time.

70. On September 4, 2013, Plaintiff requested to stay on Vistaril and to see an orthopedist.

71. Plaintiff was already on Vistaril and had been ordered to continue taking it through September 22, 2013.

72. Plaintiff was advised that he could see an orthopedist if he requested medical furlough or when he was released.

73. On September 7, 2013, Plaintiff requested medication for "horrible muscle pain that is causing headaches."

74. Dr. McClintock prescribed Ibuprofen for ten days in addition to his prescription for Flexeril.

75. Plaintiff was also advised to do neck and back stretching exercises to relieve muscle tension that could be causing the headaches.

76. Plaintiff agreed to the medical treatment plan as discussed.

77. Overall, Plaintiff saw Dr. Campos over Telemedicine four times [UMF 25, 31, 44, 52], he received treatment from a doctor indirectly an additional five times [UMF 29, 58, 63, 67, 74, 75],

and he visited the Healthcare Partners Foundation (HCP) clinic twenty times in total during his fifty-day stay [UMF 4, 22, 24, 29, 31, 34, 38, 40, 44, 51, 52, 55, 58, 60, 62, 64, 66, 69, 72, 74, 75].

78. Plaintiff was prescribed the following medication during his incarceration at TCADC: Vistaril for anxiety [UMF 33], Phenergan for stomach problems [UMF 29], Tramadol for pain [UMF 46], Flexeril for pain [UMF 54], Icy Hot Muscle Rub for foot pain [UMF 64], and Ambien for sleep [UMF 68].

79. Plaintiff was released from TCADC on September 14, 2013.

80. HCP was dismissed from this case on January 8, 2016.

81. Defendant Joe Sprunk was dismissed from this case on April 26, 2016.

### III.   MOTION FOR SUMMARY JUDGMENT

Defendants assert that they are entitled to summary judgment as to Plaintiff's ADA and state law claims. Specifically, they contend that Plaintiff fails to demonstrate he was discriminated against based on his disability as required by the ADA. Further, Defendants contend that Plaintiff's state law claims are not actionable under the NMTCA and are not applicable in light of the dismissal of Plaintiff's constitutional claim. *See* Doc. 40.

#### A.   **Legal Standard for Summary Judgment**

Summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted)). Once the movant meets this burden, the non-

moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

The Court's role is not to weigh the evidence or determine credibility, but rather merely to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *See Anderson*, 477 U.S. at 249, 255. "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor." *Id.* at 257. Further, the Court must resolve reasonable inferences and doubts in favor of the non-moving party, and construe evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 551–54 (1999). However, "viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be merely colorable or anything short of significantly probative." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (internal quotations omitted); *see also Anaya v. CBS Broad. Inc.*, 626 F. Supp. 2d 1158, 1197 (D.N.M. 2009) ("The mere existence of a scintilla of evidence will not avoid summary judgment.").

### B.  Plaintiff's ADA Claim

Plaintiff Third Claim alleges a violation of the ADA, 42 U.S.C. §§ 12131–12134. Doc. 1 at 7–8. Plaintiff alleges that Defendants violated the ADA by inadequately accommodating him for his "obvious" disabilities, including diabetes, and by failing to provide him with his orthotics. *Id*. Title II of the ADA states that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It is clear that prisons are "public entities" covered by Title II of the ADA.

*See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).  However, a claim of failure to provide adequate medical care does not constitute an ADA violation, as it is distinct from an allegation that a plaintiff was denied access to normal services and programs on the basis of their disability. *Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001); *see also Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (noting that allegedly negligent medical decisions do not ordinarily fall within the ambit of the ADA); *Nasious v. Colorado*, 495 F.App'x. 889, at *2 (10th Cir. 2012) (noting that "[t]he ADA does not provide a remedy for medical negligence or a means to challenge purely medical decisions regarding the propriety of a course of treatment") (internal quotations omitted).

As an initial matter, the uncontested statement of facts does not establish that Defendants were even made aware of Plaintiff's diabetes, nor does it show that they ignored Plaintiff's other ailments. On the contrary, Plaintiff was provided access to a primary care physician multiple times via teleconference and was prescribed various medications to alleviate his ailments. *See* Doc. 39, exs. 12, 14, 17, 26, 31, 36, 37. More importantly, there is no evidence or even specific allegations in the Complaint demonstrating that Defendants denied Plaintiff access to prison services or programs based on discrimination against him for his disabilities. *See* Doc. 1 at 7–8. Absent this, allegations of inadequate or improper treatment are not sufficient to create a material dispute as to Plaintiff's ADA claim, and summary judgment is appropriate. *See Fitzgerald*, 403 F.3d at 1144; *Breedlove v. Costner*, 405 F. App'x 338, 341 (10th Cir. 2010) (upholding dismissal of prisoner ADA claim where plaintiff "complained only about the quality and extent of medical services he received")

### C.  <u>Plaintiff's State Law Claims: New Mexico Tort Claims Act</u>

Plaintiff has brought several state law claims against Defendants including negligence, intentional infliction of emotional distress, and request for declaratory judgment. However, a plaintiff may not sue a governmental entity of New Mexico or its employees or agents unless the plaintiff's cause of action fits within one of the exceptions granted for governmental entities and public employees in the NMTCA. *Lymon v. Aramark Corp.*, 728 F. Supp. 2d 1222, 1251–52 (D.N.M. 2010), *aff'd*, 499 F. App'x 771 (10th Cir. 2012); N.M. Stat. Ann. § 41-4-17A (1978). Consent to be sued may not be implied by a government entity, but must instead come within one of the explicit exceptions to immunity under the Tort Claims Act. *See Begay v. State*, 723 P.2d 252, 255 (N.M. Ct. App.1985) (noting that "[c]onsent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act"), *rev'd on other grounds by Smialek v. Begay*, 721 P.2d 1306 (N.M. 1986). Accordingly, the Court must determine whether Defendants are subject to suit for each of Plaintiff's state law claims, or whether these claims are barred by immunity.

### 1.   Negligence Claim

Plaintiff's second claim for relief states that by their complained of intentional inactions, policies, customs, and delegated final decision makers' decisions, Defendants acted in bad faith and with deliberate indifference to the serious medical needs of Plaintiff and violated their duty of care to provide reasonable medical care to Gutwein while incarcerated by: denying medical care, denying proper medications, denying him his orthotics, and not allowing Plaintiff to see an orthopedist. Doc. 1 at 6–7. Under New Mexico Law, a negligence claim requires that the plaintiff establish four elements: (1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of duty as cause of the injury. *See Zamora v. St. Vincent Hosp.*, 335 P.3d 1243, 1249 (N.M. 2014).

As an initial matter, this Court has already determined that Plaintiff has failed to provide any evidence supporting his contention that the County intentionally implemented policies and procedures to save money by denying inmates appropriate medical care. Doc. 112 at 12. On the contrary, the County contracted the services of HCP for the very purpose of providing such medical care to inmates at TCADC. *See* Doc. 39, exs. 1–2. Further, this Court held in its previous summary judgment order, based on un-rebutted factual assertions and evidence, that TCADC: 1) provided Plaintiff with extensive access to a physician via teleconference technology; 2) provided medication for his ailments, including Vistaril for anxiety, Phenergan for stomach problems, Tramadol for pain, Flexeril for pain, Icy Hot Muscle Rub for foot pain, and Ambien for sleep; and 3) denied Plaintiff's requests to see an orthopedist based on the recommendation of Dr. Campos, Plaintiff's primary care physician, who made an individualized assessment that such care was not required in Plaintiff's case. Doc. 112 at 12–15; *see also* Doc. 39, exs. 14, 17, 18, 23, 26, 31, 36, 37.   Accordingly, Plaintiff's negligence claim against Defendants would likely fail to create a material dispute on its merits. More importantly, however, Plaintiff has failed to demonstrate an applicable waiver to Defendants' immunity under the NMTCA.

In evaluating claims under the NMTCA, plaintiffs bear the burden of relying on specific and express waivers on immunity in order to maintain their suit. *See, e.g. Rubio By & Through Rubio v. Carlsbad Mun. Sch. Dist.*, 744 P.2d 919, 921 (N.M. Ct. App. 1987). Plaintiff alleges that "[t]he County of Taos, in depriving Plaintiff of medical care may have waived immunity under the following sections of the Tort Claims Act: 41-4-6, 41-4-9, 41-4-10, 41-4-12." Doc. 1 at 9. Thus the Court addresses the applicability of each alleged waiver.

Section 41-4-6 states that sovereign immunity "does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." The New Mexico Supreme Court explained that this section creates a right of action where public employees or entities demonstrate negligent practices which create a general and unreasonable risk to safety. *See Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259 (N.M. 2006); *Archibeque v. Moya*, 866 P.2d 344, 350 (1993). However, these cases also distinguished actionable claims from those involving only a discrete administrative decision which, while negligently affecting an individual, did not render the premises more dangerous as a whole. *Id*. Courts have also applied this standard to the prison context, holding that negligent supervision of an individual inmate's medical care by a detention facility is not actionable under the NMTCA absent a showing of a generally applicable dangerous practice. *See Morrissey v. Ulibarri*, No. 08-CV-246 WJ/RHS, 2010 WL 11470879, at *5 (D.N.M. Apr. 28, 2010); *Lessen v. City of Albuquerque*, 187 P.3d 179, 183–85 (N.M. Ct. App. 2008). Here, the discrete and individualized decision not to provide Plaintiff with orthotics and access to a specialist does not fall within Section 41-4-6's waiver of immunity.

Plaintiff next contends that immunity is waived under Section 41-4-9 of the NMTCA, which states that immunity "does not apply to liability for damages resulting from bodily injury caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facilities." The basis of this allegation appears to be negligence in the operation of the medical facility on TCADC's grounds. However, this facility was entirely operated by HCP employees, who were privately contracted to provide medical care at the detention facility. Doc.

39, exs. 1–2. While outsourcing care to a private company will not relieve a state entity of its constitutional responsibilities, both state and federal case law interpreting the NMTCA have found that Section 41-4-9's waiver does not apply where a medical facility is operated by a private contractor. *See Morrissey*, 2010 WL 11470879, at *5 (holding that the Section 41-4-9 "waiver of immunity did not apply when a private contractor, rather than the prison itself, operated the medical facility"); *Lessen*, 187 P.3d at 185. As such, this waiver cannot form the basis of Plaintiff's negligence claim.

Plaintiff's use of Section 41-4-10 immunity is equally inapplicable. This section states that immunity "does not apply to liability for damages resulting from bodily injury . . . caused by the negligence of public employees licensed by the state or permitted by law to provide health care services while acting within the scope of their duties of providing health care services." However, none of the uncontested facts suggest that TCADC employees or officials provided health care services within the scope of their duties. On the contrary, the evidence establishes that TCADC contracted its health care services to HCP and that all of Plaintiff's medical care and decisions were provided by HCP physicians or employees. *See* Doc. 39, exs. 1–2, 12, 14, 17, 26, 31, 36, 37. Accordingly, this waiver does not apply to Plaintiff's claim against the present Defendants.

Finally, Plaintiff argues that the waiver in Section 41-4-12 applies. This section allows suit against law enforcement officials whose negligence resulted in deprivation of any rights, privileges, or immunities secured by the constitution and laws of the United States. However, this Court has already granted summary judgment in favor of Defendants on Plaintiff's sole constitutional claim. *See* Doc. 112. Consequently, this waiver is inapplicable and Plaintiff may not bring his negligence suit against state entity Defendants.

For these reasons, there is no dispute of material fact precluding summary judgment in favor of Defendants on Plaintiff's claim for negligence.

2.   Intentional Infliction of Emotional Distress Claim

Plaintiff's Fourth Claim for Intentional Infliction of Emotional Distress alleges that Defendants' outrageous and shocking behavior was such that they should have known that their intentional acts, failure to act, or recklessly negligent acts would cause severe psychological and physical injury to the Plaintiff. Doc. 1 at 8. The Supreme Court of New Mexico has adopted the Restatement (Second) of Torts' approach for intentional infliction of emotional distress. *See Benavidez v. Sandia Nat'l Labs.*, No. CIV 15-0922 JB/LF, 2016 WL 3996151, at *21 (D.N.M. June 27, 2016); *Baldonado v. El Paso Nat. Gas Co.*, 176 P.3d 277, 283 (N.M. 2008). The elements of intentional infliction of emotional distress are: "[(1)] the conduct in question was extreme and outrageous; [(2)] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(3)] the plaintiff's mental distress was extreme and severe; [and (4)] there is a causal connection between the defendant's conduct and the claimant's mental distress." *Baldonado*, 176 P.3d at 283 (internal quotations omitted); *see also* Restatement (Second) of Torts § 46.

With regard to IIED suits against a state entity, an individual may bring suit under the NMTCA where the emotional distress claimed arose from the violation of a constitutional or statutory right. *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep-t*, 916 P.2d 1313, 1320–21 (N.M. 1996); *Romero v. Otero*, 678 F. Supp. 1535, 1540 (D.N.M. 1987) (holding that claim of damages for intentional infliction of emotional distress, although not an enumerated tort under Section 41–4–12, may be recoverable as personal injury damages arising from a violation of a statutory right). Here, Plaintiff's only underlying constitutional or statutory claim was an

16

Eighth amendment violation under 42 U.S.C. § 1983. *See* Doc. 1 at 5–6. However, this Court has already evaluated this claim and granted summary judgment to Defendants. *See* Doc. 112. Without a meritorious underlying constitutional or statutory claim, the NMTCA does not waive immunity and Plaintiff's IIED claim cannot proceed against Defendants. *See Romero*, 678 F. Supp. at 1540;  N.M. Stat. Ann.  § 41-4-12. Accordingly, summary judgment is appropriate as to this claim.

### 3.   Declaratory Relief

In his Fifth Claim, Plaintiff asserts that he is entitled to declaratory relief "in the form of changes to policies, procedures, supervision, training, and contractual payments for medical services necessary to prevent immediate and irreparable harm, including constitutional and statutory violations, policy violations, serious injury and death." Doc. 1 at 8–9. Under New Mexico law, the Declaratory Judgment Act is a special proceeding that grants the state district courts the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." N.M. Stat. Ann. § 44-6-2 (1975). In an action seeking declaratory relief, the plaintiff must establish: "a controversy involving rights or other legal relations of the parties seeking declaratory relief; a claim of right or other legal interest asserted against one who has an interest in contesting the claim; interests of the parties must be real and adverse; and the issue involved must be ripe for judicial determination." *State ex rel. Stratton v. Roswell Indep. Sch.*, 806 P.2d 1085, 1096 (N.M. Ct. App. 1991) (quoting *Chronis v. State ex rel. Rodriguez*, 670 P.2d 953, 958 (N.M. 1983)).However, "[t]he Act does not enlarge the jurisdiction of the courts over subject matter and parties, but provides an alternative means of presenting controversies to courts having jurisdiction thereof. . . ." *Smith v. City of Santa Fe*, 171 P.3d 300, 304 (N.M. 2007) (quoting *Allstate Ins. Co. v. Firemen's Ins. Co.*, 415 P.2d 553, 554 (N.M. 1966). In this case, the

Court has determined that all substantive claims for relief are either not actionable under the NMTCA or otherwise subject to dismissal as a matter of law. *See supra* at 10-17; *see also* Doc. 112.   As no independent controversy remains, Plaintiff is not entitled to the declaratory relief sought. *See Stratton*, 806 P.2d at 1096; *Chronis*, 670 P.2d at 958. Accordingly, Defendants are entitled to summary judgment as to this count.

### IV.   CONCLUSION

For the foregoing reasons, the Court finds that Defendants are entitled to summary judgment on Plaintiff's remaining claims (Counts two through six).

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED**.

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**